United States District Court for
The Middle District of ALABAMA
NORTHERN DIVISION

RECEIVED

2006 AUG 21 A 9: 42

_____ __. ____, CLK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA

Gerard David McCree, JR.,
Petitioner,

        VS.

Jones, et, al,
Respondents,

Cause: Writ of Habeas Corpus,
(State)

2:06-CV-00520-
WHA-WO

SWORN Affidavit of Petitioner, Gerard
McCree, under penalty of perjury
The foregoing IS TRUE And Correct:
Permission of the Court for Leave To
Submit a Reply To The Respondents
answer, or other Pleadings following
The CURRENT Rule, Rule 5(e).
Rule SECTION 2254, .

Comes Now The Petitioner Gerard McCree
Moves This Court To GranT Petitioner's
Request For Leave To Submit Reply To
The Respondent's answer, following

SCANNED

2.

McCree's Convictions of three counts of capital Murder By A Jury on September, 17, 2005, in the circuit Court of montgomery county of Alabama, McCree was Sentenced To life without parole on each count, after the Jury recommended the Death penalty on a vote of 10-2.. The current incarceration of McCree is the result of these unlawful convictions and Sentences.

McCree follows this Reply Brief upon to correct, And deny all of the facts set forth in the Respondent's return, And findings of the state courts, stating: that the claims were Proceedurally Barred Because they should have been raised at trial And on direct Appeal, But were not so raised.(State exhibit K. pages 3, 4.).

3.

As herein And thereto facts
underlying The Claims Supported
By Affidavit of the Petitioner, And
Proven By way of Document Evidence
received through Official Records
Pursuant to Rule 2247, Habeas corpus
Rule Section 2254, and So viewed IN
Light of the evidence as a whole, would
Be sufficient to establish By clear
And convincing evidence that, But
for CONSTITUTIONAL error, No reasonable
factfinder would have found the Petitioner
Guilty of the underlying offense, The
Petitioner herein denys All of the facts
sets forth in the respondents Return
or alleges any other material facts
Pursuant to Rule 2243, and states:
He is in Custody in violation of the
Constitution or Laws or Treaties
of the United States. The Claims relies on--

a Factual predicate that could Not have Been previously discovered through The exercise of due diligence. As The claims was adjudicated on the merits in State court, Following Such failing to comply with the content requirement of Rule 32.6(b), A.R. Crim. P. the adjudication of the claims — resulted in a decision that was Based on an unreasonable determination of the facts in light of the evidence presented in the State courts proceedings, And the decision the was contrary to or Involved an unreasonable application of clearly established Federal Law, as determined By the Supreme Court of the United States, upon the petitioner's Allegations therein the Courts Ruling were Found to Be Arbitrary Because of the conviction which were Imposed In An UNREASONABLE MANNER, —

5.

AS Fixed OR Done Capriciously oR at Pleasure without Adequate determining Principle Not founded iN the Nature of Things, NoNRatioNaL, Not DoNe oR acting According to ReaSoN oR Judgment, DepeNding oN the will AloNg, absolutely IN power, Capriciously, tyraNNicaL, Despotic, CoRNeiL vs. SwisHeR County, Tex. Civ. App. 78 S. w. 2d 1072, 1074. without Fair Solid And SubstantiaL Cause that is without Cause BaSed upoN the law. u.S. vs. Iotempio, D.C. Ny. 58 F. 2d 358 359, NoT Governed By aNy Fixed Rules oR Standard, as which Being According with the uNited States CoNstitutioNs, The 9th. AmendmeNt holding that the eNumeration iN the CoNstitution of Certain rights Shall Not Be CoNstrued to deny oR DiSparage others retained By the People.

6.

## Allegations developed under 2254(d)(1)(2) + (e)(1)(A)(ii)(B)..

Grounds were AN evidentiary hearing Is Supported ON the Basis of the Claims for Relief. following the State Courts denial of McCree's Rule 32 petition, As all errors went unCorrected, the Records Is Supported with (Coercive police misconduct) As

The official Records Shows Arresting Officers improperly coerced Witnesses to give a Statement Implicating McCree IN the

Conviction Charges, The Records Shows No Unlawful alleged Conduct of the arresting Officials IN regards To McCree's Fourth Amendment Rights to probable Cause, While At TriaL.. The Merits Are established, upon Clearly establish Federal Law, To The extent the

7.

exhibits Supports the merits presented in light of the Evidence Thereof AN hereTo, McCree Shows That He were prejudiced By trial counsels, And were denied enffective Assistance of trial Counsel, The State Courts judgment IS IN Fact AN unreasonable Application of clearly Established Federal Law As determined By the Supreme Court of the united States, 28 U.S.C. 2254(d)(1), however the State Courts noted prejudice, IN The claims of McCree, within regards to the State Courts Judgment And their findings. IN light of pre-existing law, Lassiter, 28 F. 3d. at 1149-1150, Also Shaw, v. Garrison, 467 F. 2d 113. The Court Noticed IN Shaw's Case that Garrison, violated The federal right to Be free from Bad faith prosecution..

8.

IN light OF pre - existing law,
McCree Applies to Lassiter's case
28 f. 3d. aT 1149 - 1150, This Court
hAS held thAt EveN liability does
Not attach to A governMeNT
AgeNT uNless his Act is So
Obviously wrong IN light OF
pre - existing Law,
(See) McMilliAN, vs. JohNSoN,
Cite As 878 f. Supp. 1524 - 1525
(M.D. AlA. 1995).
However, mccree has Correctly
Applied McMilliAN, v. JohNSon
IN his Rule 32 petition, this
Case along with Cases There IN it
establishs Clearly federaL law
without regards to Prejudice.

9.

Furthermore the State Court's
IN Fact NOTiced prejudice
IN lighT Of McCree's, State Law
Claims, The adjudication of the
claims resulted IN a decision
That WAS Based oN aN unreasonable
determination of the facts iN
light of the evidence, As the
State Courts held that the
claims were procedurally Barred
Because they Should Have Been
raised At trial AN oN direct
Appeal BUT were NOT So reaised,

FACT: thAt holding Shows thAt McCree
WAS effective at trial while
Being represented By CounseL,

10.

Furthermore, the holding shows to be INCONSISTENT with Rule 32.2(d) of R. of Crim. Proc., Claims of INEFFective assistance of Counsel, This Rule Holds: that Any claims that Counsel was ineffective Must Be raised as soon as practicable, either at trial, on direct Appeal OR IN the First Rule 32. Petition which ever Is applicable.

The State Court's Findings Resulted In 2254 (d)(1)(a). As the claims were supported with case's, McCree Did Not Applie to Strickland, vs. Washington, 466 u.s. 668 (1984) IN his Rule 32 Petition. Due to a factual Predicate that Could Not have Been previously discovered through the exercise of due diligence, which the facts

II.

underlying the claims would Be
Sufficient to establish By clear
and convincing evidence that But
for Constitutional error No
reasonable factfinder would have
found the applicant guilty of the
underlying offense, 2254(e)(ii)(B)

Thereof the following claims were
Filed In This Court under 2254
holding federal questions :

Thus: McCree's Capital Murder
Convictions were obtained By
use of evidence obtained
pursuant to an unlawful Arrest,
facts to support : In united States
vs. Leon, 468 us 897 82 L Ed 2d 677
104 = ct 3405. the Court held that;

12.

Suppression of evidence Seized
in a warrant Search is
appropriate if the Magistrate
or judge in issuing the warrant
was misled By information in an
affidavit that the affiant knew was
false or would have known was false
except for his reckless disregard of
the truth or where the issuing
Magistrate wholly abandoned his
Judicial role By issuing an open-
ended warrant or where the
warrant was Based on an
affidavit so lacking in
indicia of Probable cause as to
render official Belief in it's
existence entirely unreasonable
or where the warrant is so
Facially deficient, such as in
Failing to particularize The

13.

place/to Be Searched oR the
Things to Be Seized, that the
executing Officers CanNoT
reasonably presume it to Be
valid.

However that case applied Relief
As Justice Required under the
united States Constitutions
Fourth Amendment, Concluding
that the affidavit was
INSufficient to establish
Probable cause. hereiN McCree's
Claim under count I. is
established uNder an fourth
AmendmeNt Violation, where
arresting officers coerced
witNesses to give a Statement
ImplicatiNG Gerard McCree To
It's Murder iNvestigation iN
exchange with Promises to helf
Take care of two MisdemeaNor
warrants, oNe of It's witNesses

Currently had on him.. After the witnesses cooperated with the arresting officer's, they Than secured a warrant charging Gerard Mccree, with the capital Murder of Tarvis Moore, At that Point Not any other witnesses wasn't located to support the warrant.

Thus: the evidence shows that the warrant Affidavit was Insufficient to establish probable Cause. (see) exhibit A, of the Petitioner Mccree. Discovery page 92. also 78

that Mr. Wilson drives a big truck that he hangs out at the hair shop on Highway 80.

This writer advised Detective Naquin of this information, and he asked me to go to the hair shop and see if I could make contact with that subject.

At 1255 Hours, I went to the hair shop on Highway 80, which is called the Hair Port, and spoke to black male Eric Wilson who advised he is Darria Wilson's brother. Eric Wilson stated he had already spoken to Detective S. E. Wilson and given him a phone number and advised him that he was going to call him and tell him all of the information he knew about this case if we would cooperate and help take care of two misdemeanor warrants he currently had on him. I advised Mr. Wilson that if he was willing to cooperate with us and provide us with truthful information that would help solve this case, we would see what we could do to help get him time to pay or workout some type of program to take care of the two misdemeanor warrants he currently had on him. While talking to Mr. Wilson, his brother arrived at 1300 Hours and identified himself as Darria Wilson, DOB 8/19/64, and got in the car with me. Eric Wilson advised me that one of the black males working inside his business was a girlfriend of Gerard McCree and if she saw us talking to them she would probably call him and let him know and for this reason I went down the road with Darria Wilson to speak to him. While going down the road, I got several pages from 286-1000 for 911, and it was later determined that this was Eric Wilson calling to let us know that the black female had, in fact, seen us drive off and she was asking him why Darria had left with the police and he was afraid she was going to call Gerard. While riding down the road with Darria Wilson, he advised that the Hair Port is the family business. He stated that we could make contact with him there if we could not locate him at the house. He stated that on the night that this happened he was out in his yard and he saw McCree outside at the victim's girlfriend's car talking to her. He stated that the victim pulled up and there was an argument out in the roadway. He stated that the victim got back in his car and started to drive off and McCree pulled a gun out and shot the victim. He stated that he was hesitant to cooperate because McCree is nothing but trouble and had been arrested several times and continued to get off without anything happening to him and he was afraid that he would get off this time and that if he stuck his neck out that McCree and McCree's friends would possibly try to kill him and hurt his family for that reason it made him very nervous to be cooperative with us. I advised him that we would do everything we could to ensure that this would not happen. He stated that Detective Wilson is a friend of his and Eric Wilson, his brother, and that they had known Detective Wilson for several years. He stated that he feels more comfortable speaking to Detective Wilson, and I advised him that I would have Detective Wilson meet him at headquarters at 1400 Hours if he would agree to come to headquarters at that time. He stated he would come to headquarters and talk to Detective Wilson at 1400 Hours, and I dropped him off around the side of the business

13993 (115)                                                    Page 10

I should contact her when processing of the victim's vehicle was completed so that she could pick it up. The victim's father was also present during the meeting and was recognized by Detective Barnett. Detective Barnett had arrested and charged his other son in the Jack's Quick Shop murder that occurred a month or so ago.

After the briefing with the victim's family, they were released from Police Headquarters after I answered any questions they may have and I then spoke to Detective Wilson, who advised that he had taken a taped statement from Darria Wilson, black male, DOB 8/19/64, 4001 Luther Street, PX 288-3433. During the statement Mr. Wilson told Detective Wilson that he, in fact, saw Gerard McCree shoot the victim while the victim was inside the victim's vehicle. He explained that he has known Gerard McCree for an extended period of time and positively identified McCree as the individuals that committed the shooting. Details of the interview and identification will be contained in Detective Wilson's supplementary report.

At 1542 Hours, I secured a warrant charging Gerard McCree with the Capital Murder of Tarvis Moore. At this point we were still unable to locate the victim's girlfriend, Linda Barnes, and I then had Detective Barnett complete and distribute lookouts, the first being a wanted poster for Gerard McCree, in which he was listed as wanted for Capital Murder, and the second being a lookout for Linda Barnes, who was wanted for questioning in regards to the murder investigation. Lieutenant Gantt then advised this writer that he had found out that after the police responded to the shots fired and possible shooting at Gateway and Riviera on 6/20/01, news media individuals responded to the area and subsequently interviewed several witnesses. Lieutenant Gantt had found out from one of the TV Stations that during their interviews, they were told by one witness, who was unidentified, that the victim's girlfriend, Linda Barnes, was, in fact, at the residence at 2969 Gateway Drive when the shooting occurred and that in addition to that the suspect, Gerard McCree, was at one point prior to the shooting seated in a vehicle with Linda Barnes. Montgomery Police Department computer records listed her as Linda Barnes, DOB 12/10/61, with numerous addresses, including 122 Broadway Street, 2440 Lower Wetumpka Road, 3945 Brewer Road, which is also the address of the victim, Tarvis Moore, 2402 East Sixth Street, 1639 Northgate Drive, and 1800 Dixie Court. She had an arrest on 2/28/01 for Possession of Marijuana and had received a ticket for No Driver's License and also an arrest for Carrying a Pistol without a Permit. She also had several pawned articles listed in the computer system. A vehicle registered to her in the computer system was listed as a 1993 Dodge Dynasty, blue in color, tag #3BG3734, and was registered to Linda Barnes at 122 Broadway Street.

At approximately 1710 Hours, while doing intelligence information on Linda Barnes and Gerard McCree, Lieutenant Gantt advised that he had spoken to Sheriff Marshall over the phone, who advised that he

*78*

17.

II Conviction obtained By the
Unconstitutional Failure of The
Prosecution To disclose To The
Defendant evidence Favorable
To The defendant :

Found whereBy The Record fails
To establish Facts Supporting
The Convictions For Capital
murder, Kidnapping and Robbery,
The State alleged (3) Witnesses
That Were at the Crime Scene's,
And Will testify at trial AS
Follows : Witnesses Linda Barnes
And Darria Wilson, Will Testify To
Seeing the defendant Shoot the
Victim to death After Which the
Defendant Drove off With the
Victim in the Victims Vehicle,

18.

Witness <u>Deputy Malone</u>, will testify to attempting to arrest the defendant in the area where the victim And his vehicle were discovered the following day. (see) discovery page 60.

However, the records supports that the State's case has failed. all of the State's alleged on "crime scene" witnesses has gaven a testimony to otherwise..

Witness Darria Wilson, who caused Charges to Be Served on Gerard McCree, after Cooperation with Detective's., This witness has testified to having know knowledge to McCree

19.

Taken part in the case.
(See) exhibit B.

Witness Darria Wilson,
Testimony statement
at Pages 452 - 464

1    recall her?  Hold on, Ms. Barnes.

2        MR. DEBARDELABEN:  No, Your Honor, I don't

3    see any reason to.

4        THE COURT:  Okay.  Thank you, Ms. Barnes.

5    You're excused.

6        All right.  Ladies and gentlemen, we are

7    just going to take a ten-minute break, and then

8    we're going to stop today at 5:30.  So for

9    planning purposes, we're just going to go for one

10   more hour and then stop.

11       Remember, again, when you're on break,

12   please don't discuss the case with each other or

13   with anyone else.  And y'all can go right back

14   here if you'd like for a break into the jury

15   room.

16           (Brief recess was held.)

17           (The following proceedings were held

18               in the presence and hearing of the

19               jury:)

20       THE COURT:  Okay.  We've got everyone back.

21   All right.  Mr. Kidd, we're ready for your next

22   witness.

23       MR. KIDD:  Judge, the State calls Darrell

24   Wilson.

25           DARRELL WILSON,

1          (At which time State's Exhibit

2           Number 3 was admitted into

3           evidence.)

4      MR. KIDD:  Judge, permission to play it?

5      THE COURT:  Granted.

6           (At which time an audiotape, State's

7           Exhibit Number 3, was played.)

8  Q.  Mr. Wilson, you don't deny that's your voice on

9      the tape?

10 A.  No, I don't deny it.

11 Q.  Okay.  And did you or did you not see Gerard

12     McCree get into this car with the victim?

13 A.  No.  Like I said, I didn't.

14 Q.  Mr. Wilson, you said repetitively on that tape

15     that you didn't want to testify; you wanted to

16     keep your name out of this?

17 A.  Right.

18 Q.  Why is that?

19 A.  Because I don't want no trouble.

20 Q.  Okay.  Are you afraid to testify today?

21 A.  Well, I just did.  I mean, I did.

22     MR. KIDD:  I have no further questions, Your

23     Honor.

24     THE COURT:  Any questions, Mr. DeBardelaben?

25     MR. DEBARDELABEN:  Just one.

THE COURT:  All right.

CROSS EXAMINATION

BY MR. DEBARDELABEN:

Q.   Mr. Wilson?

A.   Yes, sir.

Q.   This is the house you were in when you heard the shots; right?

A.   Yes, sir.

Q.   And do you understand from learning about this shooting that it happened down here?

A.   Yes, sir.

Q.   You're inside this house and you hear the shots?

A.   Yes, sir.

Q.   And you do agree that there's trees obstructing any view that someone might have had?  Do you see these two trees?

A.   Yes, sir.

Q.   Are they still there?

A.   No, sir.

Q.   Somebody has cut them down?

A.   Yes, sir.

Q.   When did that happen?

A.   One of them is cut down.

Q.   Okay.

     MR. DEBARDELABEN:  When did the State make

23.

1       this picture?

2          MR. KIDD:  Three weeks ago.

3   Q.   Three weeks ago.  So one has been cut down since

4       three weeks ago?

5   A.   Yes, sir.

6   Q.   Okay.  Did you know that Kenneth Cargill also

7       hung around that house?

8   A.   No, sir.

9   Q.   Do you remember telling the police that there was

10      a lady that also witnessed -- supposedly was

11      across the street?

12  A.   Yes, sir.

13  Q.   Okay.  So that's not true?  Was that not true?

14  A.   That the lady witnessed?

15  Q.   Uh-huh.

16  A.   Yes, it's true.

17  Q.   Had you ever talked to anybody -- have you ever

18      talked to that person?

19  A.   No, sir.

20  Q.   Okay.

21  A.   Oh, no.  I'll rephrase that.  Yes, sir.

22  Q.   You've talked to that lady?

23  A.   Yes.  Well, she came and talked to me.

24  Q.   Okay.  Did she tell you she didn't see anything?

25          MR. KIDD:  Objection.

1          MR. DEBARDELABEN: Well, that's hearsay. I

2    apologize.

3    Q.   Now, how many members from your basketball team

4    were there with you?

5    A.   I would say about eight or nine of them was with

6    me.

7    Q.   Okay. They didn't see anything either?

8    A.   Well, I had all of them go to the back of the

9    house.

10   Q.   Were you back there with them or inside the

11   house?

12   A.   We was inside.

13   Q.   Thank you.

14        THE COURT: Any more questions?

15        MR. KIDD: Judge, I have no questions for

16  this witness. May he be excused?

17        THE COURT: Yes. Do you need to recall

18  Mr. Wilson, Mr. DeBardelaben, or can he be

19  excused?

20        MR. DEBARDELABEN: He can be excused, Your

21  Honor.

22        THE COURT: Thank you, Mr. Wilson. You can

23  step down.

24        Okay. Next witness, Mr. Kidd?

25        MR. GREEN: Your Honor, the State would call

25.

However, Witness Linda Barnes who were asked at trial while on the stand, "If She Could Identify the person, or Shooer In the Courtroom." the Witness Could Not Do So, The Witness Ms. Barnes was asked again If She Could I.D. The Person She told Police She Seen Shooting, again Ms. Barnes Could Not do So., at that time While on the Stand, Ms. Barnes were asked " was There any doubt in your Mind that it was Gerard McCree?"

Ms. Barnes, had Shaking her head And Says heah.

Thus: This Witness Supports McCree's Convictions., (See) Exhibit C. of the Witness Barnes, testimony Transcript Page 413.

413

26.

1    Q.    Gerard came by --

2    A.    Came up from somewhere with a gun. I don't know

3          where the gun came from. I was parked there, and

4          it was just shot, pow pow.

5    Q.    Would you point to the person that you saw with a

6          gun shooting on that day?

7    A.    Huh-uh.

8    Q.    Is he in the courtroom here? Ms. Barnes, can you

9          answer my question, please? Is he in the

10        courtroom here?

11   A.    I'm afraid to answer that question.

12   Q.    Is there any doubt in your mind that it was

13        Gerard McCree shooting?

14   A.    (Witness shakes head.)

15   Q.    You're shaking your head. Is that no?

16   A.    Yeah.

17   Q.    Ms. Barnes, after the shots were fired, what

18        happened?

19   A.    The car turned left and --

20   Q.    And what happened then?

21   A.    I took a right and looked back in the rearview

22        mirror and I saw Gerard running toward the car.

23        And then I turned off again and left and turned

24        around, and something told me to go back and

25        check for Tarvis, and I turned around. When I

```
 1            got back to the four-way stop sign, I didn't see

 2            nothing but the dog in the middle of the street.

 3            And I panicked.

 4    Q.      Who else did you see there?

 5    A.      When I took another left, I was headed out, and I

 6            saw a couple of the guys that be at the house.

 7            And I asked --

 8    Q.      Is one of those guys Pierre Howard?

 9    A.      I'm not sure.

10    Q.      How old were these guys?

11    A.      I don't know.

12    Q.      Well, were they grown or were they teenagers?  Do

13            you have --

14    A.      Yes, they were grown.

15    Q.      They were grown?

16    A.      (Witness nods head.)

17    Q.      Okay.  Did you see an individual by the name of

18            Kenneth Cargill at the crime scene or a guy named

19            -- he may go by the street name of PoBoy.

20    A.      He was in his car.

21    Q.      And where was his car at?

22    A.      Parked in front of mine down the road a bit.

23    Q.      Okay.  When you returned -- after you turned

24            around, did you see Kenneth Cargill's car there?

25    A.      Uh-huh.  It was still sitting there.
```

28.

# Additional Exhibit's

However McCree were Convicted
of kidnapping and Robbery, as well
Capital Murder, the State's
witnesses failed to Support any
of the Convictions upon establishing
facts Supporting the State's
Allegations, As required And are
available to the Petitioner, The
Petitioner Moves with more
Showing of the facts that Shall
Be fully developed, As able To
Demonstrate that Petitioner is
Confined illegally And is therefore
entitled to relief,

Petitioner party's that this Court
Provide the Necessary facilities
And Procedures for an adequate
Inquiry. .,

29.

herein it Shows were witness
MS. Barnes were asked
while on the Stand at trial,

"did You See Gerard McCree Get
In the Car with the Victim?"

(As this were alleged By her Before,
and caused the kidnapping And
Robbery Charges to Be added on
To the Indictment after Being
Indicted for Capital Murder,)

The witness MS. Barnes, Stated
on the Stand: "NO" She were
Told that..

Thus; this Supports the State's
Case of Convictions for
Capital murder, Kidnapping, Robbery?

(See) exhibit d. transcript of
MS. Barnes, pages. 426- 427- 428..

30

```
1          going on.  They just was laughing and saying they

2          didn't know, give them a cigarette.  I said, damn

3          a cigarette, you know.

4    Q.    Who -- who -- you said they just laughed.  Who

5          are you talking about?  Who were you talking to?

6    A.    I didn't know.  I don't know who I was talking

7          to.  It was just guys that --

8    Q.    Were they guys that were staying there at the

9          house?

10   A.    I don't know if they was staying there, but they

11         hung around there.

12   Q.    Okay.  Were they guys that were there during the

13         shooting?  Were they present when the shooting

14         took place?

15   A.    I think so.

16   Q.    Now, you said that there were about five guys

17         that were at the house when you pulled up?

18   A.    Uh-huh.

19   Q.    Did you ever see any of these guys leave prior to

20         the shooting?

21   A.    I wasn't paying attention.  It all happened so

22         fast, I didn't even pay attention.

23   Q.    Okay.

24   A.    I don't know if they left, they stayed, or what.

25   Q.    So you came back by.  They were laughing and
```

31

```
 1              asking you for a cigarette.  You said damn a
 2              cigarette.  Where did you go then?
 3    A.        I went over to my girlfriend's house in Wynwood
 4              -- I mean, not Wynwood.  In Woodcrest.
 5    Q.        Did you call the police?
 6    A.        No.
 7    Q.        Why not?
 8    A.        I don't know.  I just panicked.  When I came back
 9              and there was nothing there but a dog, I just
10              panicked.
11    Q.        Did you know that Tarvis had been shot?
12    A.        I didn't know for sure, but I had a feeling, a
13              gut feeling, that he had -- probably had been
14              shot.
15    Q.        Why was that?
16    A.        Because --
17    Q.        What did you see that made you feel that way?
18    A.        Because the first time he slumped over, he came
19              back up.  The second time he fell over, I didn't
20              see him come back up.  I didn't know if he was
21              laying low to try to drive off, because the car
22              was started moving.  I don't know.  So I wasn't
23              sure.
24    Q.        Did you see Gerard McCree get in the car with
25              him?
```

428

3₂

1    A.    No.  I was told that, but when I looked back --

2    Q.    Okay.  Well, I'm not going to ask you but what

3          did you see.

4    A.    When I looked back in the rearview mirror, I just

5          saw him running toward the car.

6    Q.    Okay.  Did you see anybody else running toward

7          the car?

8    A.    No.

9    Q.    Now, after you went over to your girlfriend's

10         house, where did you go then?

11   A.    I left there and I went back on the north side of

12         town where my kids was at another girlfriend's

13         house.

14   Q.    Okay.  Did you call the police at that time?

15   A.    No.

16   Q.    At some point in time did you eventually go over

17         to this hotel where you had a room?

18   A.    Yes, later on that night.

19   Q.    Who went with you?

20   A.    No one.

21   Q.    Your kids didn't go with you?

22   A.    No.

23   Q.    Where did they stay?

24   A.    They stayed over at my girlfriend's house in

25         Chisholm.

```
 1    Q.    Okay.  Why didn't you take your kids over to the
 2          hotel?
 3    A.    I thought they would be better off where they
 4          were.  They were around their friends and stuff.
 5          So I just -- they wanted to stay, so I left them
 6          there.
 7    Q.    When you got to the hotel, did you call the
 8          police?
 9    A.    No.
10    Q.    Did you call anybody?
11    A.    I think I called his mom, but that was --
12    Q.    You said his mom.  Whose mom are you referring
13          to?
14    A.    Travis' mom.
15    Q.    Why did you call his mom?
16    A.    Because I felt so bad it happened to him and I
17          called to let her know.
18    Q.    And what did you let her -- you said you let her
19          know.  What did you let her know?
20    A.    I told her I think Tarvis had been shot.
21    Q.    After you spoke to her, did you call the police
22          then?
23    A.    No.  I figured they would call or check into it
24          because she said, well, I'll call you back; let
25          me call around.
```

3ʻl

```
 1    Q.   Now, after you had the conversations with his

 2         mother, with Travis' mother -- that's Ms. Madison

 3         sitting right here in the courtroom with us;

 4         correct?

 5    A.   I know who she is.

 6    Q.   But that's who you spoke to?

 7    A.   Yes.

 8    Q.   And you told her that you thought Tarvis had been

 9         shot?

10    A.   Yes.

11    Q.   Did the police ever come out to the hotel?

12    A.   No.  A detective did.

13    Q.   Well, a member of the police department?

14    A.   Yes.

15    Q.   A detective?

16    A.   Yes.

17    Q.   And why did he come out there?

18    A.   To ask me some questions.

19    Q.   And what kind of questions was he asking you?

20    A.   Did I -- were I the one driving that car.  I said

21         yes.  And he asked me did I hear anything about a

22         shooting or something.  I can't recall the second

23         question.  They only asked me two questions.

24    Q.   Did you tell --

25    A.   And I think I said no, no.
```

1   Q.   Okay.

2   A.   And he gave me a card.

3   Q.   Did you tell him anything about the shooting?

4   A.   No.

5   Q.   Did you tell him that you thought that your

6        ex-boyfriend may have been shot?

7   A.   No.

8   Q.   Why didn't you tell him?

9   A.   Afraid.

10  Q.   Afraid of who?

11  A.   I just was scared and afraid.

12  Q.   Now, after the police officer left, did you ever

13       see Gerard McCree that night?  Or let me ask you

14       this.  Did you ever talk to Gerard McCree that

15       night?

16  A.   Yes.

17  Q.   Where did you or how did you talk to him?

18  A.   He knocked on the door.

19  Q.   Okay.  The door of what?

20  A.   My room.

21  Q.   Okay.  Did you answer the door?

22  A.   Yes.

23  Q.   And it was Gerard McCree?

24  A.   Yes.

25  Q.   What did he say to you?

36

```
1    A.    He just say I saw the detective just left.

2    Q.    What else did he say?

3    A.    And he said -- he said why is everybody calling

4          my name.  I didn't do nothing.  Did you see me do

5          anything?  I said no.

6    Q.    Did you ask him about the shooting?

7    A.    No.  He didn't say -- we didn't say.  I didn't

8          discuss it.  He didn't discuss it.  He just said

9          he had to go.

10   Q.    Did you ask him where Tarvis Moore was at?

11   A.    No.

12   Q.    Did you ask him what he did with him?

13   A.    No.

14   Q.    Did you wonder what he had done with him?

15   A.    I was wondering where the car and Tarvis was, but

16         I didn't ask him.

17   Q.    Now, when you called his mother, what time was it

18         when you called her?

19   A.    I don't recall.

20   Q.    What time was it when you went over to the hotel?

21   A.    It had to be about 10:00, 9:00, 10:00, somewhere

22         in there.

23   Q.    And what time did the shooting occur at to your

24         recollection?

25   A.    I think it was about 6:00, 6:30, something in
```

37

III. Conviction obtained By the unconstitutional failure of the prosecution to disclose evidence to the defendant:

Evidence that supports the Petitioner's Innocents were By the founding of alleged Fingerprints found in the inside of the victims car, in several place's one Being the steering wheel of the victims car, AS these fingerprints were given To the Jury, the Record fails to establish the identity of these unknown fingerprints, Petitioner Contends that this is AN Fourteenth Amendment, Substantive due process Violation, AS were Requested in the State Court Before the Trial of McCree, And were granted Discovery, Rule 16.1(f)

38

ala. Rule of Crim. P. Discovery
under other provisions of Law
Nothing in this Rule 16.1 Shall Be
Construed To limit the discovery
of exculpatory material or
other material to which a dEfCNdant
is eNtitled under CONStitutioNal
provisions or other provisions of
Law. A CONVICTION obtained through
the use of false evidence Must fail
Mooney, vs. Holohan 294 U.S. 103 55
S.Ct 340 79 L. ed. 791 (1935). EVEN IF
The State Merely allows the false
evidence to go uNCorrected (see)
Alcorta, vs. texas, 355 U.S. 68 78 S.ct.
103 2L. ed. ad. 9 (1957). Courts reCogNize
that a defendant's rights to a fair
trial is violated When the State
Knowingly allows false evidence
to Be used against the
defendant, Miller, vs. pate, 386
U.S. 1, 87 S.Ct. 785, 17 L. ed. 2d.
690 (1967), Similarly a Lefendants

Rights are Violated if the State
Withholds Favorable Material
evidence which the defendant
has requested, Brady v. Maryland
373 U.S. 83 S. Ct. 1194 10 L.ed.ad.
215 (1963),...


IV. Petitioner was denied effective
assistance of counsel,
facts were established upon the
failure of the trial counsel's to
Impeach the arresting officers
upon their unlawful conduct of
coercing witnesses to give a
statement to obtain evidence
against the petitioner mccree,...
Grounds that should Have Been
requested to suppress evidence
obtained pursuant to the warrant,
as It were Insufficient to
establish probable cause.

40

The Petitioner were prejudice By its trial Counsel's unprofessional errors, the counsel's deficient performance deprived the petitioner of his fair trial Rights, u.s.c.A. Const. Amend. 6, (see) BELL, vs. State, 879 So. 2d 423., But for Counsel's unprofessional errors the result of the Proceeding would Have Been different, McNish, vs. State, 878 So. 2d 1189, Bates, vs. State, 819 So. 2d 519,.,

Petitioner follows the Showing that he was denied a full And fair evidentiary hearing IN The State Court, under Rule 8, Subdivision (a) OF Rules - Section 2254 cases holding under townsend, vs. Sam, 372 U.S. 293, 319 (1963): determining when a hearing In the federal habeas Proceeding is mandatory, the

41

appropriate Standard IS where
Facts are IN dispute, holding the
questions: If The habeas applicant
did Not Receive a Full And Fair
evidentiary hearing in the State Court,
either at the time of the trial or
in a Collateral proceeding, As
here the Burden on the petitioner
to Show, (1). petitioner did Not
receive a Hearing at the time
of trial on his Claims. (2) petitioner
were granted a evidentiary hearing
IN The Rule 32 proceeding, the
hearing were set for august, 11,
2005, upon the Cleary established
evidence thereof, And hereto, The
Respondents filed a Motion to
reconsider it's Order, Granting An
evidentiary hearing, the court
Granted the State's Motion,
Dismissing McCree's petition without

An evidentiary hearing, after being appointed counsel's to represent the petitioner in the proceeding.

With respect to an asserted denial of a federal Right which constitutes Grounds for discharge under 2254 habeas corpus proceedings,

herein the petitioner seeks immediate, or speedier Release from illegal Confinement under 2244(c).

Petitioner: #203840
Gerard D. McCree
Donaldson Corr. Fac.
100 Warrior Ln.
Bessemer, Ala. 35023